[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12023
Non-Argument Calendar
_____

D.C. Docket No. 8:16-cv-00766-VMC-JSS

RICKEY SHEW
FRANCES SHEW,

                                                            Plaintiff-Appellants,

versus

WILLIAM HORVATH,

                                                            Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(October 4, 2017)

Before WILLIAM PRYOR, MARTIN, and ANDERSON, Circuit Judges.

PER CURIAM:

        This appeal requires us to decide whether the district court erred when it

granted summary judgment in favor of William Horvath and against Rickey Shew

and Frances Shew's complaint that Horvath violated the Shews' Fourth Amendment right to be free from unreasonable searches and seizures. *See* 42 U.S.C. § 1983. We affirm.

## I. BACKGROUND

In November of 2002, the Shews purchased a home in Hernando County, Florida. In 2008, Frances noticed cracks in the walls of the house, and the Shews contacted their insurer, Florida Farm Bureau. Experts employed by the Farm Bureau initially opined that a sinkhole did not cause the cracks. Farm Bureau then declined to renew the Shews' insurance policy in May of 2009. The Shews filed suit against Farm Bureau for its failure to cover damage caused by a sinkhole, and the Shews hired Bay Area Sinkhole Investigation and Civil Engineering, who concluded that a sinkhole caused the damage to the home. After reviewing this report, one of the experts employed earlier by Farm Bureau agreed with Bay Area. The Shews also received a copy of the Bay Area report, although they assert that they did not read the report.

The Shews and Farm Bureau settled the claim on August 16, 2010. The Shews received $240,000, and both of the Shews signed an agreement stating that the "insured property suffered a covered loss due to sinkhole activity on or around December 15, 2008." Farm Bureau then filed with the Hernando County Clerk a document that stated, "Pursuant to Florida Statute [section] 627.7073(2)(a), please

find the enclosed land subsidence report which confirms and certifies sinkhole activity at the residence of Rick and Fran Shew . . . ." County records do not contain evidence of sinkhole remediation.

On June 16, 2015, Rickey and Frances signed a contract to sell the house to Christopher Jernigan for $229,000. The contract contained a clause that required the purchaser to apply for a mortgage within five days of execution. The contract was contingent on Jernigan "obtaining a written loan commitment" within thirty days. And the contract included a disclosure clause that stated that "[s]eller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer." Jernigan only later learned of the sinkhole. He backed out of the contract and reported the alleged misrepresentation to the Hernando County Sheriff's Office.

Horvath, a detective at the Hernando County Sheriff's Office, conducted an investigation. He communicated with Jernigan, who informed Horvath that Jernigan had asked Rickey "about any problems the home may have had," and that "the only deficiency [Rickey] brought to [Jernigan's] attention" was an exposed wire that had since been repaired. Horvath then obtained Jernigan's records, a copy of the sales contract, a copy of the Shews' complaint against Farm Bureau, the settlement agreement, the sinkhole report filed with the County Clerk, and two of the expert reports.

3

Horvath also interviewed the Shews. Frances denied that the house had a sinkhole and told Horvath that Rickey had handled both the dispute with Farm Bureau and the attempted sale to Jernigan. According to Horvath, Rickey also denied that the house had a sinkhole issue, but "admitted that he filed an insurance claim with Farm Bureau due to structural damage in his house" and that an inspector had concluded that a sinkhole had caused the damage. Rickey also "stated that prior to listing the home on the market, he checked with the Hernando County clerk and property appraiser to see if any official reports had been on file against his home and property regarding confirmed sinkhole activity." Finally, Rickey conceded that "no sinkhole remediation process ever occurred on the property and the only repairs were done by him[,] which was patching cracks in the drywall."

Horvath also interviewed Catherine Sickler, the Shews' realtor in the sale to Jernigan. According to Horvath's report, Sickler told him that that the property was "a sinkhole house" and Sickler said that "Frances was involved in the sales process."

Horvath did not visit the property during his investigation, and he never personally determined whether the alleged sinkhole and structural damage were "readily observable." He instead relied on the engineering reports and witness

4

statements. Horvath also did not confirm whether a mortgage lender actually relied on the Shews' representation.

On October 12, 2015, Horvath executed a pair of affidavits to obtain arrest warrants for the Shews. The affidavits asserted that the Shews had "[c]ommit[ted] the offense of Mortgage Fraud . . . by making [a] material misstatement, misrepresentation, and omission that would be relied upon by a mortgage lender involving the contracted sale . . . ." Florida defines mortgage fraud as follows:

> A person commits the offense of mortgage fraud if, with the intent to defraud, the person knowingly: (a) Makes any material misstatement, misrepresentation, or omission during the mortgage lending process with the intention that the misstatement, misrepresentation, or omission will be relied on by a mortgage lender, borrower, or any other person or entity involved in the mortgage lending process . . . .

Fla. Stat. § 817.545(2)(a). The affidavits also explained Horvath's evidence and conclusions.

A state attorney approved the affidavits, and Horvath presented them to a judge. The judge issued arrest warrants for the Shews, and the Shews turned themselves in. The State Attorney later elected not to prosecute the case.

The Shews filed a lawsuit against Horvath in his individual capacity under section 1983 of title 42 of the United States Code. The Shews alleged that Horvath violated their Fourth Amendment rights when he "completed a probable cause affidavit in support of a warrant for [their] arrest . . . [that] was so lacking in establishing probable cause that [Horvath] knew or should have known that there

5

was no probable cause to support an arrest of [the Shews]." The district court granted summary judgment in favor of Horvath on the basis of qualified immunity.

## II. STANDARD OF REVIEW

"We review *de novo* the district court's disposition of a summary judgment motion based on qualified immunity, resolving all issues of material fact in favor of Plaintiffs and then answering the legal question of whether Defendants are entitled to qualified immunity under that version of the facts." *West v. Tillman*, 496 F.3d 1321, 1326 (11th Cir. 2007). Summary judgment is appropriate when there are no genuine issues of material fact. Fed. R. Civ. P. 56.

## III. DISCUSSION

The Shews contend that Horvath is liable for the "unreasonable seizure and malicious prosecution" of the Shews because Horvath lacked probable cause when he completed his affidavit, but we disagree. Horvath is entitled to qualified immunity because he had probable cause to believe that the Shews had committed mortgage fraud as defined by the Florida statute. Officers "enjoy a qualified immunity from suit that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Croom v. Balkwill*, 645 F.3d 1240, 1245 (11th Cir. 2011) (internal quotation marks and citation omitted). We have explained that officers are entitled to qualified

6

immunity against claims of false arrest if the officer had "arguable probable cause" to arrest the suspect. *See Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999) ("An arrest without probable cause is unconstitutional, but officers who make such an arrest are entitled to qualified immunity if there was arguable probable cause for the arrest."). We have also held that "probable cause bars [a section] 1983 malicious prosecution claim." *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003). We assess probable cause "based on the information known to defendants at the pertinent times." *Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir. 1990).

Horvath's investigation gave him probable cause to believe that the Shews had committed mortgage fraud. He had reason to think that both of the Shews were culpable in the light of Sickler's statement that "Frances was involved in the sales process." And Horvath could reasonably conclude that the Shews acted with intent to defraud. Horvath discovered that Jernigan had asked "about any problems the home may have had," and that "the only deficiency [Rickey] brought to [Jernigan's] attention" was an exposed wire. Rickey also stated that he had "patch[ed] cracks in the drywall" and checked public records for sinkhole activity before listing the house, even though Rickey possessed an expert report that identified sinkhole activity. A reasonable officer could infer that the Shews had concealed the sinkhole damage and intended to deceive prospective buyers. Horvath could reasonably conclude that a failure to mention a sinkhole that was the

7

subject of a $240,000 settlement was a "material . . . omission" that "[would] be relied on by a mortgage lender, borrower, or any other person or entity involved in the mortgage lending process." Fla. Stat. § 817.545(2)(a). Indeed, Jernigan backed out of the contract after learning of the sinkhole. Finally, Horvath had reason to believe that the nondisclosure occurred during the mortgage process. Although he did not personally confirm that Jernigan was seeking a mortgage at the time of the relevant statements, the contract required the purchaser to apply for a mortgage within five days of execution and was contingent on Jernigan "obtaining a written loan commitment" within thirty days. This pair of terms would allow a reasonable officer to conclude that Jernigan was actively seeking a mortgage.

Although the Shews contend that Horvath should have conducted a more thorough investigation, officers need not "track down every lead" as long as they do not ignore or withhold "relevant, exculpatory evidence of which [they are] aware." *Kelly v. Curtis*, 21 F.3d 1544, 1551 (11th Cir. 1994). Horvath's communications with interested parties and review of relevant documents gave him probable cause to believe that the Shews had committed mortgage fraud. The district court did not err when it granted summary judgment in favor of Horvath.

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of Horvath.